UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:10-CR-126 JD |
| | ) | Case No. 3:12-CV-720 JD |
| MICHAEL SHENEMAN (01) | ) | |

## OPINION AND ORDER

This matter is now before the Court on the Defendant Michael Sheneman's motion for relief under 28 U.S.C. § 2255. In a previous order, the Court denied Mr. Sheneman relief on most of his claims, but held that the record was insufficient to resolve his claim of ineffective assistance of counsel. The Court thus directed the parties to supplement the record with evidentiary support for their positions, and subsequently appointed counsel for Mr. Sheneman and granted limited discovery. The parties have now made their supplemental filings and have submitted briefs on the question of whether, in light of the supplemented record, a hearing is warranted on this remaining claim. For the following reasons, the Court concludes that the record conclusively demonstrates that Mr. Sheneman is not entitled to any relief under § 2255, so it denies his request for a hearing and denies his motion under § 2255.

## I. FACTUAL BACKGROUND

The factual background of this case has been set forth extensively in prior orders by this Court [DE 111, 150, 166] and by the Seventh Circuit Court of Appeals. *United States v. Michael Sheneman*, 682 F.3d 623 (7th Cir. 2012); *United States v. Jeremie Sheneman*, 538 F. App'x 722 (7th Cir. 2013). Those facts, as set forth by the court of appeals on Mr. Sheneman's direct appeal, are as follows:

> From 2003 to 2005, Sheneman and Jeremie worked in tandem to defraud both real estate buyers and mortgage lenders through a series of calculated misrepresentations. Generally speaking, their plan involved acquiring control over

a large number of rental properties, inducing buyers to purchase the properties through a host of false promises, and ensuring that lenders would finance the purchases by falsifying loan documents and misrepresenting the buyers' financial standing.

Sheneman and Jeremie began by acquiring control over a large number of rental properties being sold by landlords in the South Bend and Mishawaka areas of Indiana. Many of these sellers had difficulty renting out their properties—some were in very poor condition—and were, by and large, simply looking to cut their losses and walk away from the homes with their mortgages and taxes paid. They agreed to sell their properties to either Sheneman or Jeremie, both of whom had a reputation for "flipping" homes and selling them at a profit. Although most sellers believed they had sold their properties directly to either Sheneman or Jeremie, the sellers had in fact merely granted one of the two power of attorney over their properties. By exercising powers of attorney, Sheneman and Jeremie took control over the properties without ever appearing on any chain of title. The sellers, for their part, did not notice much of a practical difference. Each seller received the amount of money agreed upon as the selling price—albeit not from a title company, as would normally be the case, but directly from either Sheneman or Jeremie. After they "flipped" the houses and sold them to new buyers for more than the seller's asking price, Sheneman and Jeremie then endorsed and deposited the checks issued by the title company directly into their own accounts, yielding them hefty profits.

Once granted control, Sheneman and Jeremie then set about searching for buyers to purchase the dilapidated properties. Eventually, they found their marks, selling sixty properties to four buyers with no relevant real estate experience: Gladys Zoleko, a Cameroonian citizen in the United States on a student visa, bought fifteen homes; Paul Davies, a Liberian citizen also on a student visa, bought fourteen homes; David Doo[]little, an electrician, bought twenty-one homes; and Gary Denaway, a maintenance worker, bought ten homes. For each buyer, a very similar pattern of conduct transpired.

Sheneman and Jeremie made a wide range of promises to the buyers—false promises, as it turns out—in order to induce the sales. The buyers were all looking for an additional source of income, and Sheneman promised them just that. Significant profits could be made by purchasing homes and then renting them out— the more homes purchased, the bigger the profit. The homes were all in excellent condition, buyers were assured, and either Sheneman or Jeremie would make any necessary repairs. There was also little risk because most of the homes already had paying tenants living in them, and Sheneman and Jeremie would help find new tenants for vacant homes. And if the buyers ever wanted to get out of the real estate business, Sheneman and Jeremie promised to buy back properties that they no longer wanted. Perhaps most enticing of all, Sheneman and Jeremie also promised to cover all down payments and closing costs. The buyers, despite their relatively modest incomes, could therefore purchase a large number of homes and begin earning an immediate profit—without having to spend a dime out-of-pocket. They jumped at the chance.

The buyers, for their part, ignored some clear red flags. Most obviously, they were only permitted to see one or two of the properties they were purchasing prior to closing. The other homes, buyers were told, had tenants already living in them and a visit to those homes might disturb the tenants. But the buyers were assured that the other homes were all in similar condition and located in comparable neighborhoods.

Buyers filled out only minimal paperwork throughout the process. Sheneman brought each potential buyer to Superior Mortgage, a mortgage broker where Jeremie worked as a loan officer. There, each buyer completed a few documents with some very basic information. Shortly thereafter, Jeremie informed the buyer that he or she was approved to buy a large number of properties. In order to ensure that mortgage lenders approved the loan applications, however, Jeremie falsified key parts of the documents. Among other misrepresentations, numerous loan applications falsely stated the buyers' citizenship, employment status, and finances, and the buyers' signature on many documents was often forged.

Beyond falsifying documents, Sheneman and Jeremie took other steps to secure financing from lenders and ensure the closings took place. First, they artificially inflated buyers' bank accounts, depositing tens of thousands of dollars in order to make it appear as though the buyers had sufficient assets to take on the loans. After the transactions were completed, the money was returned to Sheneman and Jeremie. Second, they masked the buyers' financial infirmities from lenders by utilizing certified checks to cover down payments and closing costs. Lenders therefore had no way of knowing that the buyers were not the true source behind these payments, as the loan documents contemplated.

After closing, each of the buyers quickly discovered that the deals they were promised were too good to be true. A number of the newly purchased homes were hardly habitable. Some had faulty plumbing, others had significant mold and termite damage, and yet others had structural damage and leaky roofs. Moreover, paying tenants were difficult to come by. Many of the homes did not have tenants living in them—despite previous assurances to the contrary—while others had tenants who never paid rent. Often, the few homes that the buyers had actually viewed prior to closing were not even included among the properties they had purchased. Many of the properties were also located in worse neighborhoods than the ones they had visited.

When the buyers contacted Sheneman and Jeremie to repair the homes or assist them in finding tenants, as they had promised to do, they were suddenly difficult to reach. The buyers' calls would often be ignored, or Sheneman and Jeremie would hang up when the buyers began complaining. In the end, Sheneman and Jeremie made very few repairs to the properties and reneged on their promise to buy any of them back. Unsurprisingly, each of the buyers was soon unable to make timely mortgage payments. Of the sixty properties: thirty-six were foreclosed upon, eleven were deeded back to the lender in lieu of foreclosure, six were demolished by the city, and four were sold in tax sales.

Sheneman and Jeremie were indicted on October 13, 2010, and charged with four counts of wire fraud in violation of 18 U.S.C. § 1343. After a four-day jury trial, they were convicted on all four counts. At sentencing, the district court calculated Sheneman's advisory sentencing guidelines range to be 87 to 108 months' imprisonment. In doing so, the court applied several sentencing enhancements, including enhancements for a loss amount of more than $1 million, using sophisticated means, having ten or more victims, and gaining more than $1 million in gross receipts from a financial institution. The district court then sentenced Sheneman to 97 months' imprisonment.

*Sheneman*, 682 F.3d at 626–28 (footnotes omitted).[1]

The Seventh Circuit affirmed Mr. Sheneman's conviction and sentence on appeal, and Mr. Sheneman timely moved to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. In a previous order, the Court rejected most of the bases for relief Mr. Sheneman presented, but took his claim of ineffective assistance of counsel under advisement pending further submissions and briefing. [DE 255].

## II.  STANDARD OF REVIEW

Section 2255(a) of Title 28 provides that a federal prisoner may claim "the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, [and] may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir.2007). Thus, the Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which

---

[1] For a detailed summary of the testimony of each witness, see Docket Entry 150 (*United States v. Sheneman*, 2012 WL 1831551 (N.D. Ind. May 18, 2012)).

inherently results in a complete miscarriage of justice." *Harris v. United States,* 366 F.3d 593, 594 (7th Cir. 2004).

## III.  DISCUSSION

The one remaining claim in Mr. Sheneman's § 2255 petition is whether he received constitutionally adequate assistance of counsel. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. To satisfy this right, an attorney must not only be present with a criminal defendant at his trial, but must assist the defendant in a way that ensures the trial is fair. *Strickland v. Washington*, 466 U.S. 668, 685 (1984).  A fair trial is one in which the adversarial process functions properly to produce a just result. *Id*. at 686.

To prevail on a claim for ineffective assistance of counsel, Mr. Sheneman must establish two elements: first, that his counsel's performance was deficient, and second, that the deficient performance prejudiced his defense. To satisfy the first element, Mr. Sheneman bears the burden of demonstrating "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.  To show deficient performance, the defendant must show "that counsel's representation fell below an objective standard of reasonableness." *Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland,* 466 U.S. at 688).  "This means identifying acts or omissions of counsel that could not be the result of professional judgment.  The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Id.* (citing *Sussman v. Jenkins,* 636 F.3d 329, 349 (7th Cir. 2011)).

Further, "there is a strong presumption that [the defendant's] attorney performed effectively," *Berkey v. United States*, 318 F.3d 768, 772 (7th Cir. 2003), and that the challenged

conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted). The reasonableness of counsel's performance must be evaluated "from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). So long as an attorney articulates a strategic reason for a decision that was sound at the time it was made, the decision generally cannot support a claim of ineffective assistance of counsel. *Li v. United States,* 648 F.3d 524, 528 (7th Cir. 2011) (citing *United States v. Lathrop*, 634 F.3d 931, 937–38 (7th Cir. 2011) (provided counsel's reasons for not questioning further were not "so far off the wall that we can refuse the usual deference that we give tactical decisions by counsel, his performance will not qualify as deficient")); *United States v. Cieslowski*, 410 F.3d 353, 360 (7th Cir. 2005).

Even if Mr. Sheneman establishes this first element, he must also demonstrate that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. To establish prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eckstein v. Kingston*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694); *United States v. Best*, 426 F.3d 937, 945 (7th Cir. 2005) (same). "In weighing the effect of counsel's errors, the court must consider the totality of the evidence. . . . A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record." *Eckstein*, 460 F.3d at 848 (quoting *Hough v. Anderson*, 272 F.3d 878, 891 (7th Cir. 2001)). Failure to satisfy either the performance or the prejudice prong of the *Strickland* test is fatal to a defendant's ineffectiveness claim. *Velarde v.*

*United States*, 972 F.2d 826, 828 (7th Cir. 1992); *see Strickland,* 466 U.S. at 687 (reasoning that "[u]nless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable").

In his initial filing and various supplements and amendments, Mr. Sheneman presented a scattershot of issues as to which he found fault with his counsel, David Jones. These included several substantive arguments that he believes his counsel should have raised, such as objecting to improper jury instructions and a constructive amendment of the indictment, and scores of additional witnesses, pieces of evidence, and arguments that he asserts his counsel should have investigated or offered at trial. In its previous order, the Court found that each of the substantive arguments were baseless, so counsel could not have been ineffective for failing to raise them. As to counsel's performance at trial, the Court also found that counsel either had done or could not have done several of the things Mr. Sheneman identified, so it eliminated those as potential errors or omissions that could support an ineffective assistance of counsel claim.

Thus, what remains of Mr. Sheneman's ineffective-assistance claim is that counsel was constitutionally ineffective for failing to investigate or to call or make use of the following witnesses or exhibits at trial:

> (1)    Alan Butz and Jack Griffith, to testify that powers of attorney are commonplace and are frequently used for purposes other than when a party is unable to attend a closing; and that it is commonplace in the industry of buying residential real estate to restrict contact with tenants pre-closing and to rely on property inspections to ascertain the condition of the properties.

> (2)    A signed loan application and a Truth in Lending packet for the California property, to show that the property was not switched on Ms. Zoleko.

> (3)    The tenant of each property, and representatives of the utility companies, appraisal firms, and insurers, to testify that every home sold by Mr. Sheneman, directly or indirectly, was rented at the time it was sold; and utility bills from the properties to demonstrate the same.

(4)     Stan Molenda, to testify that all of the homes sold in South Bend owned by Mr. Sheneman or controlled by him through powers of attorney were up to code at the time of the sale.

(5)     A forensic accountant, to testify that all of the moneys provided by Mr. Sheneman in connection with the transactions were fully disclosed to the lenders on the purchase agreements.

(6)     The specific lender representatives who approved each loan at issue; to testify that the "down payment moneys" were fully disclosed to them in the closing Settlement Statements, and were not material to the issuance of the loans.

(7)     Brenda Buck and Steve Kollar, to testify that they perpetrated the mortgage fraud on Mr. Denaway's loans.

(8)     A handwriting expert, to testify that Ms. Zoleko's handwriting, not Jeremie's, appears on her loan applications.

(9)     Andrew Beam, to testify about rampant mortgage fraud at Superior Mortgage not involving either of the Shenemans; that he actually interviewed the buyers and personally signed their loan application; and that Lauren Duesler and Gladys Zoleko, not Jeremie, made any false statements on the loan applications.

(10)    Ms. Zoleko's 302 report, to impeach Ms. Zoleko with prior inconsistent statements that she signed a purchase agreement and probably three other forms at her first meeting with Jeremie, and that she had met Andy Beam at Superior Mortgage.

In order for the Court to analyze whether counsel was deficient in failing to offer this evidence or whether any deficiency prejudiced Mr. Sheneman's defense, Mr. Sheneman must provide support for what this testimony or evidence would have been had it been introduced at trial. *Wright v. Gramley*, 125 F.3d 1038, 1044 (7th Cir. 1997) ("It is firmly established that in order to succeed on a failure to investigate claim, the petitioner must demonstrate what the attorney would have discovered had a proper investigation occurred, as well as what evidence would have been introduced at trial."); *United States v. Ashimi*, 932 F.2d 643, 649–50 (7th Cir. 1991) (holding that to succeed on a failure to investigate or failure to introduce favorable evidence claim, "we must know what the attorney would have discovered after 'adequate' investigation" and what the purportedly favorable evidence would have been at trial). In the case

of uncalled witnesses, this typically means presenting affidavits from the witnesses setting forth what their testimony would have been had they been called to testify at trial. *Wright*, 125 F.3d at 1044 ("In the case of an uncalled witness, we have held that at the very least the petitioner must submit an affidavit from the uncalled witness stating the testimony he or she would have given had they been called at trial."); *Ashimi*, 932 F.2d at 650 ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or an affidavit."); *see also Wooten v. Hartwig*, No. 96-1880, 108 F.3d 1380 (table), 1997 WL 119585, at *2 (7th Cir. 1997) ("[The petitioner] failed to submit affidavits with his habeas petition setting out the potential testimony of these uncalled witnesses. We have only [the petitioner]'s word as to how they might have testified. Such speculation is not sufficient to support an ineffective assistance claim.").

Mr. Sheneman's initial motion provided little in the way of support for his far-reaching assertions of what this evidence would have been at trial. Therefore, the Court directed the parties to supplement the record with evidentiary support for their claims. Rule 7 of the Rules Governing Section 2255 Proceedings for the United States District Courts (stating that a court "may direct the parties to expand the record by submitting additional materials relating to the motion"); *Lafuente v. United States*, 617 F.3d 944, 946–47 (7th Cir. 2010) (noting that a "district court also has the authority to order discovery or something short of a full-blown hearing to allow adequate inquiry into a petitioner's claim, or to help the court determine whether a full hearing is necessary"); *Wright*, 125 F.3d at 1044 (stating that the "Supreme Court has also made it clear . . . that the district court has the prerogative of fashioning a course of proceeding short of a full-blown hearing to avoid the need for such a hearing"). In particular, the Court directed Mr.

Sheneman to submit affidavits from each of his would-be witnesses confirming what their testimony would have been had they been called to testify at trial.

Mr. Sheneman has since had the opportunity to assemble and submit those materials. The government has also submitted certain evidentiary materials, and has filed a detailed affidavit by Mr. Jones that explains the reasoning behind his handling of each of the issues in dispute. Because Mr. Sheneman has the burden of identifying the acts or omissions of counsel that constitute ineffective assistance, the Court first addresses each alleged deficiency individually. As to each one, the Court first considers whether Mr. Sheneman has provided adequate support for what the particular evidence would have been at trial, and then, as necessary, considers the two *Strickland* elements. Next, because ineffective assistance of counsel is a single claim no matter how many deficiencies a petitioner alleges, and because the adequacy of an attorney's performance and the existence of any prejudice must be evaluated based on the entirety of the trial, the Court evaluates the two *Strickland* elements as a whole.

## A.      Mr. Sheneman's Individual Complaints about His Counsel's Performance

Mr. Sheneman argues that his attorney was ineffective for failing to investigate or introduce the following evidence at trial.

### 1.      Alan Butz and Jack Griffith

Mr. Sheneman first argues that his attorney should have called Alan Butz and Jack Griffith, who allegedly have expertise in the mortgage brokerage business. Mr. Sheneman asserts that these witnesses would testify that powers of attorney are commonplace and are frequently used for purposes other than when a party is unable to attend a closing, and that it is commonplace in the industry of buying residential real estate to restrict contact with tenants pre-closing and to rely on property inspections to ascertain the condition of the properties.

However, Mr. Sheneman has offered no affidavits from these witnesses or any other substantiation for how they would have testified at trial. Counsel has even acknowledged that no support is available as to these witnesses: "At the date of filing this Reply [October 14, 2014], there does not appear to be any material from Petitioner/Defendant that goes to Alleged Deficiencies 1, 3, 5, and 6." [DE 296 p. 6]. Mr. Sheneman's own self-serving speculation as to how these witnesses might have testified at trial is insufficient to warrant a hearing for these witnesses to testify, particularly given the opportunity the Court has afforded him to provide support for his assertions. *Wright*, 125 F.3d at 1044; *Ashimi*, 932 F.2d at 650. And without some showing of what testimony these witnesses would have offered at trial, the Court has no basis on which to conclude that counsel was ineffective for failing to investigate or utilize these witnesses, or that any prejudice could have accrued to Mr. Sheneman's defense as a result.

In any event, counsel has articulated sound strategic reasons for not calling these witnesses. Specifically, counsel represents that, at his direction, "an investigator found and spoke with these . . . individuals. The investigator informed [him] they were either going to refuse to testify or their testimony would not be favorable to Michael Sheneman." [DE 285-1 p. 2]. Counsel concluded from this that these witnesses' testimony was unlikely to help Mr. Sheneman, and declined to call them.[2] "A lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review. 'The Constitution does not oblige counsel to present each and every witness that is suggested to him.'" *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997) (quoting *United States v. Balzano*, 916 F.3d 1273, 1294 (7th Cir. 1990)).

---

[2] In his own affidavit, Mr. Sheneman argues that counsel has not submitted documentation showing that he conducted this investigation. However, Mr. Sheneman professes no personal knowledge as to whether counsel conducted such an investigation, and a lack of documentation does not create a factual dispute as to the credibility of counsel's sworn statement.

Having contacted these witnesses, counsel decided for strategic purposes not to call them, and such a decision does not indicate ineffectiveness.

In addition, counsel believed that the points Mr. Sheneman wished to make through these witnesses could be addressed more effectively by introducing evidence through and cross-examining government witnesses. For example, as to powers of attorney, counsel showed through his cross-examination of Ms. Tyl and Mr. Shaw, who had each given Mr. Sheneman power of attorney to sell homes they owned, that the use of powers of attorney was not uncommon or suspect, and that there were valid reasons for using them as to their homes. He also showed that the powers of attorney were publicly filed, which tended to rebut the government's assertion that Mr. Sheneman used them to conceal his interest in the homes. Counsel believed that "this testimony was particularly powerful because it came from the government's own witnesses," and "considered it to be an unwise strategy to call further witnesses to testify about the powers of attorney, as [he] did not wish to draw additional attention to Michael Sheneman's use of these documents and risk any damaging cross-examination of the witnesses [he] might call." [DE 285-1 p. 4].

Likewise as to Mr. Sheneman restricting the buyers' contacts with tenants and their ability to view the homes, counsel also introduced other evidence, largely through the government's own witnesses, to counter the allegations against Mr. Sheneman. He decided that "calling additional witnesses would have focused the jury on the testimony that Michael Sheneman had concealed the condition of houses and abused any 'common practice' in the industry," and thus decided as a strategic matter not to offer further evidence on that point. These decisions were well within the range of reasonable trial decisions, and thus do not suggest that counsel was ineffective for not calling these witnesses.

Mr. Sheneman has not shown any potential prejudice from the omission of these witnesses, either, as would be required to meet the second *Strickland* prong. As indicated above, Mr. Sheneman has not demonstrated what these witnesses' testimony would have been at trial, so the Court has no basis to conclude that there is a reasonable likelihood that the result of the trial would have been different had they testified. In addition, counsel addressed each of these issues quite thoroughly at trial. In fact, Mr. Sheneman admits in his affidavit that Mr. Jones "did prove the standard practice of using Power-of-Attorney was commonplace," which forecloses any prejudice on that issue. As to the buyers' contact with tenants and ability to view the homes, counsel established through cross-examination of each of the buyers that they had the right to inspect the homes; he introduced multiple appraisals that were performed on the homes; and he introduced the contract through which Ms. Tyl gave Mr. Sheneman power of attorney, which stated, "It is expressly understood that NO ONE is to have any direct contact with or approach the tenants of any of the properties." [Ex. M-31]. Mr. Sheneman has not identified any respect in which the testimony by these additional witnesses would add any appreciable value on top of that evidence, so no prejudice could have resulted from its omission from trial.

## 2. Pre-Closing Documents for the California Street Property

Second, Mr. Sheneman argues that his counsel should have introduced documents relating to the California Street property, including a purchase agreement, a truth in lending statement, and two loan applications. He believes that this evidence would have contradicted Ms. Zoleko's testimony that she did not realize she was purchasing a house on California Street until she arrived at a closing for that property, and that she did not recall having picked that property to purchase. The government used this testimony to argue that the Shenemans would switch properties on the buyers, showing them desirable properties to entice them to make the purchases but having them actually buy less desirable properties.

In support of this argument, Mr. Sheneman has submitted a Truth-In-Lending Disclosure dated September 2, 2005; a purchase agreement dated September 20, 2005; a loan application with a date in the fax line of October 3, 2005; and an undated loan application. Thus, the Court considers whether counsel acted reasonably in declining to contradict Ms. Zoleko's testimony with these documents. In explaining why he did not use these materials to cross-examine Ms. Zoleko, counsel stated:

> This evidence would not have address Zoleko's testimony, as it would not show that she knew of the property in September 2005 because she testified that her signatures on the documents and applications were forged. I chose not to ask Zoleko whether her signature in September 2005 was forged, given that she likely would have testified that it was a forgery, which would have provided evidence that the Shenemans had, in fact, attempted to conceal her purchase of the California Street property. I desired to separate the conduct of Michael Sheneman as much as possible from that of Jeremie Sheneman, and such a question and answer would have undercut that strategy.

[DE 285-1 p. 9].

Counsel's handling of this issue was well within the range of how reasonably competent attorneys might choose to address Ms. Zoleko's testimony. Even when confronted with various other documents that bore her signature, Ms. Zoleko denied having seen the documents before, which added strength to the government's argument that Jeremie had forged or manipulated signatures. Choosing not to present additional documents that Ms. Zoleko would likewise deny having seen, so as to avoid emphasizing this aspect of her testimony, was a reasonable decision. For that similar reasons, the presence of Ms. Zoleko's signature on documents relating to the California Street property would not necessarily establish that Ms. Zoleko had signed or seen the document in its completed form. For example, as even Mr. Sheneman's handwriting expert acknowledged, the handwritten loan applications in Ms. Zoleko's name were photocopies of each other but with the various property addresses added. Similarly, as to the California Street property, the Truth-In-Lending Disclosure Mr. Sheneman submitted is dated September 2, 2005,

and includes the precise amount Ms. Zoleko would be borrowing to finance the loan. [DE 298-2]. But the purchase agreement for the California Street property was not dated until September 20, 2005, which suggests that the Truth-In-Lending Disclosure could not have been completed when Ms. Zoleko signed it. Presenting this type of contradictory evidence to the jury and potentially corroborating the government's allegations of other misconduct would have been a risky choice, and competent counsel could reasonably choose not to do so.

In addition, this evidence would have had little impact on the outcome of the trial, and counsel responded to the allegation that the Shenemans switched the property through other means. During his cross-examination of Ms. Zoleko, counsel established that she had an opportunity to consider whether to purchase any of the homes, that her signature appeared on documents dated prior to the closing stating that she had a right to receive an appraisal, and that appraisals were completed for each property. Ms. Zoleko also admitted that this same process occurred for each one of the properties she purchased, which would include the California Street property. Moreover, the pertinent aspect of this testimony was not when Ms. Zoleko realized she was purchasing the California Street property, but that she had not asked to purchase this property in the first place, and these documents do not speak to that issue. Since the testimony about the property being switched was of such minor importance and was already countered in this fashion, there is no reason to believe that the result of trial may have been any different had counsel offered this additional evidence on the same point. Thus, Mr. Sheneman has failed to meet either *Strickland* prong as to this evidence.

### 3. Tenants from Every Property, and Representatives from the Utility Company, Appraisal Firm, and Insurer for Every Property, and Utility Bills

Mr. Sheneman next asserts that his attorney should have offered a variety of evidence to establish that every home at issue to which he was connected was rented at the time it was sold.

15

This includes the utility bills from each property, in addition to a number of witnesses, including the tenants of every property, plus representatives from the utility company, from each appraisal firm that appraised the properties, and from the insurer of each property. As to these witnesses, Mr. Sheneman has neither identified who those witnesses would be, nor shown what their testimony would have been had they testified at trial. Thus, the Court need not further consider that evidence.[3] *Wright*, 125 F.3d at 1044; *Ashimi*, 932 F.2d at 650.

Mr. Sheneman did attach a set of what appears to be utility bills to his initial petition. [DE 185-6]. However, counsel offered sound reasons for declining to utilize that sort of evidence at trial: "Such . . . evidence would not have directly rebutted the testimony that, when the buyers were able to view the homes, they had no tenants. Utility bills do not necessarily demonstrate who used the utilities in the houses, or the specific dates on which the utilities were used, or what the particular charges were for . . . ." [DE 285-1 p. 10–11]. This is a reasonable explanation, so his choice not to offer this evidence does not support an ineffective-assistance claim. Further, the bills Mr. Sheneman submitted would have had almost no probative value. They list the total usage of electricity and the amount billed for certain periods, but there is no way to know from those bills whether the figures are consistent or inconsistent with the properties being occupied. Likewise, as counsel indicated, the utility bills cannot establish who, if anyone, was using the electricity or if, for example, air conditioners were merely running in vacant homes. Therefore, Mr. Sheneman's defense could not have been prejudiced by the absence of those bills.

---

[3] Needless to say, though, calling every tenant of the sixty properties at issue—some of which were multi-unit properties—is not a strategy that every (or any) reasonably competent attorney would have adopted, and counsel acted reasonably in approaching this topic in other ways.

### 4.    Stan Molenda

Next, Mr. Sheneman argues that his counsel should have called Stan Molenda from the Code Enforcement Division of the City of South Bend. In support of this argument, Mr. Sheneman has submitted an affidavit from Mr. Molenda. In his affidavit, Mr. Molenda states that he met Mr. Sheneman around 2001 or 2002, and that at the time, Mr. Sheneman "was working with others who owned properties or were investing in properties. As such these properties were not in the name of Mike Sheneman. This was [a] fairly common occurrence at the time which was around 2003–2005." [DE 286-1]. According to Mr. Molenda, "Mike Sheneman's work involved picking up or taking ownership of properties with code violations and then fixing those violations." [*Id.*]. Mr. Molenda then states that as to four different properties purchased by Ms. Zoleko, there are no records of code violations around the time Ms. Zoleko purchased the properties. He also states that he has heard of Eric McGinnis and Kevin Shaw, two of the sellers, and is not aware of any code violations for their homes. In further support of this claim, Mr. Sheneman has attached an affidavit from his current attorney, which indicates that in response to a public records request seeking any reported code violations in 2005 on forty of the properties at issue, the City produced no documents.

The government also submitted an affidavit from Mr. Molenda. In that affidavit, Mr. Molenda clarifies that he has "no independent knowledge of the condition of such homes, and no way to determine whether they complied with code requirements or not," and that he does not know whether any of the homes were in fact "up to code" at any time. [DE 299-1]. Rather, his knowledge is based only on the existence of reported code violations in government records, which are typically only discovered after complaints about a property. He also clarified that the Code Enforcement Division does not independently inspect residential homes in connection with a sale of those homes.

Given the submission of this evidence, the Court turns to the two *Strickland* prongs.

Counsel identified the reasoning behind his decision not to call this witness as follows:

> I considered it more effective to question the witnesses with firsthand knowledge of the homes—the sellers—regarding the condition of the homes. I questioned the individuals who sold their homes to Michael Sheneman on the condition of those homes. . . . Any additional testimony would have been superfluous and simply restated the points already made by the sellers of the houses themselves.
>
> . . .
>
> Additionally, the witness identified by Sheneman could not have testified that the houses sold to the buyers were up to code at the time of the sale or when the buyers first viewed them, which is when the buyers alleged that the houses were in poor condition. The most the witness could have done was to state whether there had been any reported code violations, which would not have rebutted the government's argument. Particularly given the evidence that had been introduced on cross-examination of the government's witnesses, I did not deem it to be a good strategic decision to call this witness.

[DE 285-1 p. 12–13]. In addition, based on his investigator's contact with Mr. Molenda, counsel did not believe that Mr. Molenda "would have been a willing witness or provided testimony helpful to Michael Sheneman." [*Id.*].

These are perfectly sound and reasonable strategic reasons for declining to call Mr. Molenda as a witness. Mr. Molenda had no first-hand knowledge of the condition of any of the homes in question, and there is no indication of the rate at which actual code violations are reported to or discovered by the Code Enforcement Department. The absence of reported code violations thus has little, if any, probative value as to the actual condition of the homes. Meanwhile, counsel was able to introduce evidence through several other avenues to support the quality of the homes, all of which was based on first-hand knowledge. He examined the sellers—all of whom were government witnesses—about the quality of the homes they sold to or through Mr. Sheneman, and they testified that the homes were in good condition. [*E.g.*, DE 71 p. 127 (Tyl: "Q. The six houses that you let Mr. Sheneman sell for you, were they in good condition? A.

I think they were in good condition. I kept them in good condition."); DE 72 p. 19 (Shaw: "[T]hey were all rentable. It was my income. . . . They were all livable. They were all in good conditions. I always felt that my houses were the best ones on the block. I was very proud of my houses.")]. He also introduced several appraisals, each of which described the condition of the homes, [Ex. M-3, M-9, M-12, M-16, M-28], and he called an appraiser who testified as to his personal observations of one of the properties and of the renovations that had been done to that property. [DE 78 p. 45–59]. Counsel's decision to address the quality of these homes through this evidence rather than by calling Mr. Molenda was well-within the range of reasonable trial strategy and is entitled to deference on review, so Mr. Sheneman cannot meet the first *Strickland* prong as to this witness.

Likewise, there is no probability that the result of trial might have been different had Mr. Molenda testified. Given his lack of personal knowledge of the condition of any of the homes at issue, Mr. Molenda's testimony had almost no value to add to Mr. Sheneman's defense. In fact, calling such a witness with so little to add could even detract from the credibility and persuasiveness of the defense as a whole. Given the minimal weight of this evidence and the fact that counsel ably presented other more direct and meaningful evidence on this topic, there is no likelihood that counsel's decision not to call Mr. Molenda resulted in prejudice to Mr. Sheneman's defense.

### 5. Forensic Accountant

Mr. Sheneman next argues that counsel should have retained and called a forensic accountant to testify that all of the moneys provided by Mr. Sheneman in connection with the transactions were fully disclosed to the lenders in the purchase agreements. In order to demonstrate that counsel's failure to consult with or call an expert constituted deficient performance, a defendant "must demonstrate that an expert capable of supporting the defense

was reasonably available at the time of trial." *Ellison v. Acevado,* 593 F.3d 625, 634 (7th Cir.2010); *United States v. Royal*, No. 08 C 5541, 2012 WL 1520820, at *5 (N.D. Ill. Apr. 30, 2012). Here, Mr. Sheneman has not identified any forensic accountant who could have testified at trial, nor given any indication of what such an expert's testimony would have been.[4] Thus, the Court has no basis on which to conclude that counsel may have been ineffective for failing to investigate or call such a witness, or that any prejudice could have accrued to Mr. Sheneman's defense, so the Court need not consider this putative evidence any further.

### 6. Lender Representatives who Actually Approved Each Loan

Mr. Sheneman further asserts that his counsel was ineffective for failing to call the actual individuals who approved each of the loans on behalf of the lenders. Mr. Sheneman believes that these individuals would testify that none of the falsehoods in the loan applications were actually material to their decision to approve the loans, and that all of Mr. Sheneman's financial contributions were fully disclosed to them. Again, however, he has failed to identify who these individuals are or substantiated what their testimony would have been had they testified at trial. Thus, counsel's failure to call these witnesses cannot form the basis of an ineffective-assistance claim.[5]

---

[4] It also seems unlikely that any forensic accountant would have favorable testimony to offer since, as discussed below, even if a forensic accountant could testify that Mr. Sheneman's payments were disclosed through the purchase agreements to the extent they went to closing costs, Mr. Sheneman has identified nothing that would have disclosed his payments of the buyers' down payments as well.

[5] Mr. Sheneman also briefly argues that his Sixth Amendment right to confront the witnesses against him was violated because the government did not call these individuals as witnesses at trial. That argument is frivolous, as the Sixth Amendment does not require the government to call all potential witnesses against a defendant to testify at trial.

### 7.     Brenda Buck and Steve Kollar

Mr. Sheneman next argues that his attorney was ineffective for failing to call Brenda

Buck and Steve Kollar as witnesses. According to Mr. Sheneman's own affidavit, Ms. Buck

"would testify that all loan applications concerning Gary Denaway's purchases was [*sic*] a face

to face interview with Brenda Buck and Gary Denaway, only," and that "Jeremy [*sic*] Sheneman

was not allowed to do any paperwork on Gary Denaway's loans, as it would have been a conflict

of interest." [DE 286-2]. Mr. Sheneman has not submitted an affidavit from Ms. Buck, though,

or offered any other evidence besides his own word as to how she would testify, and he has

given no indication at all as to what Mr. Kollar's testimony would have been.

This is an insufficient basis to present an ineffective-assistance claim based on the

absence of witnesses. This claim clearly fails as to Mr. Kollar, as Mr. Sheneman has not even

attempted to identify the substance of his testimony. As to Ms. Buck, all the Court has is Mr.

Sheneman's self-serving speculation as to how she would testify, which does not suffice. *Wright*,

125 F.3d at 1044. In other contexts, the fact that Ms. Buck's name appears on Mr. Denaway's

loan applications as the interviewer may provide some support for an assertion that she actually

interviewed Mr. Denaway for the application. But that topic was explored at length at trial, and

even though Jeremie's name does not appear on a single loan application, every buyer insisted

that Jeremie was the only person they interacted with in completing the loan process. [*E.g.*, DE

77 p. 18–19 (Denaway: "Q. Turning to the next page of that loan application, do you see it

indicates that you had a face-to-face interview with someone named Brenda Buck in connection

with this loan application? A. I see it, but I didn't have a face-to-face -- I didn't talk to her about

any of the loans. Q. It was Jeremie Sheneman that you talked to about the loans, right? A.

Correct.")].[6] Thus, this fact alone gives the Court no reason to believe that Ms. Buck would have taken the stand and testified that she had actually taken the fraudulent loan application with Mr. Denaway.

In addition, Mr. Sheneman has offered no explanation for his failure to procure an affidavit from Ms. Buck; he has only represented that he "is not of the view that [Ms. Buck] would consent to providing an affidavit." [DE 286]. He does not indicate what efforts he made to secure an affidavit or why he believes she will not provide one. Since Mr. Sheneman has already been given an opportunity and appointed counsel for the purpose of conducting such an investigation and was directed to procure an affidavit, but has failed to do so or explain why, the Court has no reason to give Mr. Sheneman any further opportunity to corroborate this testimony. Thus, Mr. Sheneman's claim fails as to these witnesses because he has not adequately provided support for how they would have testified.

Regardless, counsel has offered valid reasons for declining to call these witnesses, so Mr. Sheneman fails to show ineffective assistance in this respect anyway. Counsel states:

> I did not believe that Buck and Kollar would implicate themselves in mortgage fraud if they testified. Rather, I deemed it more likely that they would implicate the defendants who were on trial, Michael and Jeremie Sheneman. Given that Buck and Kollar had not been charged with a crime, it would not have been in their interest to provide information that could have led to such charges.
>
> Even had Buck and Kollar implicated themselves in mortgage fraud, this would not have countered the testimony from Zoleko, Davies, Doolittle, and Denaway regarding Michael Sheneman's role in the mortgage fraud. Identification of additional participants in mortgage fraud would only have made it appear to the jury that Superior Mortgage was a hotbed of illegal activity. I did not consider it strategically beneficial to Michael Sheneman to call witnesses who would likely not absolve him of liability and might provide additional information regarding allegedly illegal activity.

---

[6] Ms. Zoleko and Mr. Davies likewise testified that they had not been interviewed by Mr. Beam for the loan applications, even though his name appears on their applications as the interviewer. [DE 72 p. 151, 181]

[DE 285-1 p. 16–17].

These are defensible strategic reasons for declining to call these witnesses. As counsel notes, even if Ms. Buck had testified that she took Mr. Denaway's loan application and that Jeremie did not complete the loan paperwork himself, that would not negate Jeremie's role in that aspect of the fraud. For example, Mr. Denaway also testified that Jeremie had fabricated false employment information and pay stubs for him because Jeremie knew the loans would not go through if Mr. Denaway was unemployed. This testimony was supported by documentary evidence, and was uncontradicted. Whether Jeremie was also the one who entered that information into the loan application is unimportant by comparison. Counsel thus acted reasonably in deciding not to confront that evidence and to instead distance Mr. Sheneman from it entirely. And for that same reason, no prejudice resulted to Mr. Sheneman's defense from the absence of these witnesses from trial. Therefore, Mr. Sheneman has failed to meet either *Strickland* prong as to this evidence.

Finally, in its previous order, the Court took Mr. Sheneman's claim of ineffective assistance at sentencing under advisement solely as to the question of whether counsel was ineffective for failing to present testimony from Ms. Buck. [DE 255 p. 37]. Because Mr. Sheneman has failed to substantiate Ms. Buck's testimony, that claim necessarily fails too. Further, as extensively discussed in this Court's orders on Mr. Sheneman's sentencing and restitution objections, the evidence supporting the Court's findings on loss amount and restitution far exceeded a preponderance of the evidence, and the proffered testimony by Ms. Buck would not affect those conclusions, so this claim would fail for that independent reason as well.

### 8.     Handwriting Expert

Mr. Sheneman next argues that his counsel should have retained and called a handwriting expert to testify that Ms. Zoleko's handwriting, not Jeremie's, appears on her loan applications, and that the signatures on various documents are her genuine signatures. In support of this argument, Mr. Sheneman has submitted two reports from an expert that he has retained during these habeas proceedings.[7] In her first report, Sharon Rose Hampton, a Certified Forensic Document Examiner, examined twenty documents bearing a signature in Ms. Zoleko's name. One contained Ms. Zoleko's signature on her driver's license, others would have been signed by Ms. Zoleko at closing, but some were dated prior to the closings. Ms. Hampton offered the following conclusion to a "highly likely" degree of forensic certainty:

> It was determined from a thorough examination of each signature, using accepted document examination methodology, that there were SIGNIFICANT FUNDAMENTAL SIMILARTIES among all of the [examples], with an absence of significant fundamental differences. Indicating a single writer, Gladys Zoleko, of S-1 thru S-20. Indications of disguise were found in documents dated 9-2-05. Disguise is used to deny signatures at a later time.

[DE 290-2]. In response, the government submitted a report from its own expert, who reviewed the same materials and was unable to reach any conclusion as to whether the signatures were actually signed by Ms. Zoleko. [DE 299-2].

In a subsequent report, Ms. Hampton examined four handwritten loan applications, which were trial exhibits 23, 24, 25, and 27. She first concluded that these documents were photocopies of each other, but with certain information added to each one, such as the property address and purchase price. Ms. Hampton then compared the handwriting of the property addresses in the

---

[7] Though Ms. Hampton's affidavits do not expressly state that she would have been available to testify to these conclusions at the trial in 2010, her resume indicates that she provided expert testimony in other cases in that time period, and her affidavits indicate she is willing to testify in this matter, so the Court presumes that she would have been available to testify at trial. *Thomas v. Clements*, No. 14-2539, 2015 WL 3687911, at *11 n.2 (7th Cir. June 16, 2015).

applications, and compared that handwriting to handwriting found on the document containing a copy of Ms. Zoleko's driver's license, which Ms. Hampton had used in her previous report. In addition to a copy of the driver's license, that document contains what appears to be a post-it note with Ms. Zoleko's name, address, and other information in handwriting. Having apparently compared the handwriting of the addresses against the handwriting on that page, Ms. Hampton concluded that they were written by the same individual, whom Ms. Hampton concluded was Ms. Zoleko. Ms. Hampton again found indications of disguise, too. [DE 298-5].

Since trial counsel did not retain or present a handwriting expert, the question is whether he reasonably decided not to pursue that avenue of investigation. An attorney need not investigate every potential witness or piece of evidence in order to provide constitutionally effective assistance of counsel. Rather, an attorney has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. In discharging this duty, counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Harrington v. Richter*, 562 U.S. 86, 107 (2011). As to investigating expert testimony in particular, the Supreme Court has explained:

> Criminal cases will arise where the only reasonable and available defense strategy requires consultation with experts or introduction of expert evidence, whether pretrial, at trial, or both. There are, however, "countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." Rare are the situations in which the "wide latitude counsel must have in making tactical decisions" will be limited to any one technique or approach.

*Id.* at 106 (citations omitted). Thus, so long as the choice is reasonable at the time, counsel may develop and pursue defense strategies without first consulting with experts on a given issue. *Id.* at 107 (noting that "there were any number of hypothetical experts . . . whose insight might possibly have been useful" in preparing a defense, but that counsel could reasonably decide not

to investigate expert testimony where doing so would be "distractive from more important duties").

Here, counsel offered the following explanation for his decision to not consult a handwriting expert:

> Zoleko never testified that Michael Sheneman had filled out any loan applications. Rather, her testimony on this topic focused on Jeremie Sheneman. I specifically made that point with Duesler that she had never seen "Michael Sheneman fill out a loan application." Given that the trial testimony did not implicate Michael Sheneman in any misconduct involving loan applications, I decided as a strategic matter not to utilize a handwriting expert. I desired to separate the conduct of Michael Sheneman as much as possible from that of Jeremie Sheneman, and such a witness would have undercut that strategy.

[DE 285-1 p. 17].

The Court finds that this decision was well-within the range of how reasonably competent counsel might approach this evidence. As counsel correctly notes, there was never any allegation that Mr. Sheneman was responsible for any of the fraudulent aspects of the loan applications, or that he was involved in that process at all. Thus, counsel could largely deflect these allegations from Mr. Sheneman by demonstrating that he had nothing to do with them. Counsel in fact did that quite effectively, as he established during cross-examination of each of the buyers that Mr. Sheneman had little or no knowledge about their financial condition and was not involved in the loan application process. [DE 72 p. 87 (Zoleko), 196–97 (Davies), 258 (Doolittle); DE 77 p. 32–33 (Denaway)]. He also established during his cross-examination of Ms. Boettcher and Ms. Duesler that Mr. Sheneman was not involved in the loan application process at Superior Mortgage.

Granted, this evidence could still inculpate Mr. Sheneman if the jury found that the fraud in the loan applications was part of a scheme in which Mr. Sheneman was participating. But that made it all the more important for counsel to separate Mr. Sheneman from the allegations against

Jeremie, which is why he chose not to pursue the handwriting analysis. Choosing to confront this evidence that only alleged wrongdoing by Jeremie would have undercut the defense's overarching argument that the jury need not even consider this evidence as to Mr. Sheneman because it only concerned Jeremie and the jury was required to consider each defendant separately. It would have also had limited upside too, since, as discussed below in the prejudice analysis, even showing that someone else wrote Ms. Zoleko's applications would not have negated the strong evidence of Jeremie's responsibility for this aspect of the fraud.

In addition, pursuing the handwriting analysis would not have been without its own risks. For one, the jury would not have been compelled to believe a handwriting expert. Ms. Duesler, who was personally familiar with Jeremie's handwriting from reading his writing often, testified that she recognized the handwriting as Jeremie's. Ms. Zoleko likewise testified that the writing was not hers. The government could have also called a rebuttal expert to discredit Mr. Sheneman's expert or to present a contrary opinion. Perhaps the jury would believe Mr. Sheneman's expert, which could cast doubt on the credibility of the government witnesses and distance Mr. Sheneman somewhat more from the fraud in the applications. But perhaps it wouldn't, in which case the defense would have damaged its own credibility over an issue that offered it relatively little benefit. And at the very least, calling such an expert would have likely invited a battle of the experts and a detour into the mechanics and reliability of the science of handwriting analysis. *Richter*, 562 U.S. at 109 (holding that counsel was not ineffective for failing to investigate an expert where doing so could have made a central issue out of evidence that could be damaging to the defendant and where there was a possibility "that expert testimony could shift attention to esoteric matters of forensic science . . . or transform the case into a battle of the experts").

By contrast, counsel could be sure that the evidence he elicited at trial (such as the testimony of Ms. Boettcher, Ms. Duesler, and each of the four buyers) would support his argument that Mr. Sheneman was never personally involved with the loan application process, as there was no allegation to the contrary. That evidence would allow counsel to sow doubt as to Mr. Sheneman's accountability for the loan applications, while avoiding the distraction, the risk to the defense's credibility, and the inconsistency to the defense's theory of the case that would be posed by trying to prove who wrote the loan applications. *See Richter*, 562 U.S. at 109 ("To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates."). Engaging in this sort of cost-benefit analysis is a strategic matter as to which counsel are entitled to deference, and counsel was not unreasonable in deciding that separating Mr. Sheneman from the loan application process altogether was preferable to attempting to establish who handwrote Ms. Zoleko's applications.

Finally, this was not the type of issue that demanded that any reasonable counsel consult with an expert on this topic. The government did not use a handwriting expert of its own to establish who had written the loan applications or signed the documents; it addressed that topic solely through the testimony of its lay witnesses. In addition, the identity of the individual who handwrote Ms. Zoleko's application and the number of documents she signed prior to closing were far from central issues or crucial facts in this case, particularly as to Mr. Sheneman. Ms. Zoleko was only one of four buyers who testified in the case, all of who testified that they only interacted with Jeremie as to the mortgage process, and counsel had other avenues available to confront this evidence.

Ultimately, it is clear that the reason counsel did not investigate a handwriting expert was not mistake or inadvertence. Nor was his decision arbitrary or outside the range of how competent counsel would have acted under the circumstances of this case. Therefore, the Court concludes that counsel's decision not to investigate a handwriting expert in formulating and presenting Mr. Sheneman's defense was a reasonable one and is entitled to deference, so Mr. Sheneman has failed to meet the first *Strickland* prong as to this evidence.

In addition, even had counsel acted unreasonably in failing to present this evidence, little prejudice could have resulted. First, as to the analysis of the signatures, Mr. Sheneman argues that Ms. Hampton's testimony was necessary to address Ms. Zoleko's testimony that she had only signed one document prior to the closings. However, Ms. Zoleko admitted during Mr. Jones' cross-examination that her actual signature appeared on a number of documents that were dated prior to the closings. These included two notices of her right to receive a copy of an appraisal, [DE 72 p. 97 (Exhibit M-2), 110 (Exhibit M-8)], and three purchase agreements, [DE 72 p. 101–02 (Exhibit M-4), 109 (Exhibit M-7), 116 (Exhibit M-11)]. She also admitted during cross-examination by Jeremie's attorney that her signature appeared on additional documents. In fact, she never denied that any signature was actually hers. The handwriting analysis could thus have established little that counsel did not show through Ms. Zoleko's own admissions—it could not establish when or under what circumstances the signatures came to be on the documents, or the contents of the documents at the time—so it would add almost no additional value on this point. And because Ms. Zoleko made no effort to deny the authenticity of any of her signatures, Ms. Hampton's opinion that the signatures contained indications of disguise would have been of little importance.

The analysis of the handwriting on the loan applications would have been of little value, too. First, even if accepted, it would have contradicted the testimony of only one of the four buyers as to only part of her testimony about one of the aspects of the scheme to defraud. This evidence would not undercut the strong evidence of Mr. Sheneman's own fraudulent conduct in inducing the buyers to purchase the homes and, most notably, making the buyers' down payments, which is an undisputed fact for which he has yet to offer any plausible explanation. Nor would showing that Ms. Zoleko had understated her own involvement in falsifying her loan applications exonerate Jeremie or Mr. Sheneman from responsibility for that aspect of the fraud. Jeremie had years of experience in the mortgage industry, and knew exactly what lenders were looking for and what information in a loan application could disqualify a buyer. The four buyers, meanwhile, were all real estate neophytes, yet each of their applications falsified or omitted just the right information to ensure the lenders would approve their loans, and in some aspects, they did so in similar respects. Evidence that the buyers were aware of or participated in the fraud in the loan applications thus would not have negated the strong inference that Jeremie was involved as well.

Second, the report's conclusion appears to rest entirely on an assumption for which the Court can find no support in the record or in Ms. Hampton's own reports. Ms. Hampton's report states that she identified Ms. Zoleko as the writer of the addresses on the loan applications by comparing that handwriting to handwriting on the document that contains Ms. Zoleko's driver's license. As mentioned above, that document contains a copy of Ms. Zoleko's driver's license in the top half, and a post-it note with Ms. Zoleko's name and other information in handwriting in the bottom half. There is no independent support in the record to indicate who wrote the bottom

portion of the document, though. The document was not introduced at trial, and there is no indication in the record as to the source of the document or even its authenticity.

Rather, Ms. Hampton's report identifies Ms. Zoleko as the writer of that document based only on her first report, which had analyzed the signature in Ms. Zoleko's driver's license against other known and unknown samples of Ms. Zoleko's signatures and concluded that they were all signed by her. That report only analyzed signatures, though—it did not identify the writer of the handwriting on that document, nor did it even purport to compare that handwriting against Ms. Zoleko's somewhat stylized signature. Thus, it appears that Ms. Hampton's conclusion is based entirely on the assumption that because handwriting appears on the same page as a copy of Ms. Zoleko's driver's license, the writing must be hers. No reasonable jury could rely on such an assumption, and it appears equally plausible that the handwriting on that document was actually Jeremie's. In addition, without any known exemplar of Ms. Zoleko's handwriting, Ms. Hampton's handwriting comparison would not even satisfy Rule 702's admissibility standard. Thus, Mr. Sheneman has failed to meet *Strickland's* prejudice prong as to this evidence, too.

### 9. Andrew Beam

Mr. Sheneman next faults his counsel for failing to call Andy Beam, who owned Superior Mortgage. Mr. Sheneman asserts that Mr. Beam would have testified to a number of things, including that he personally met face-to-face with Ms. Zoleko and signed her loan applications as the interviewer, that he did not allow Jeremie to have any contact with the lenders, and that the Shenemans had no control over the loan documents, in addition to testifying about various other practices in the mortgage industry. [DE 286-2]. However, Mr. Sheneman has provided no corroboration for these self-serving claims as to how Mr. Beam would testify.

In fact, the only objective indications Mr. Sheneman has submitted as to how Mr. Beam would testify—excerpts from a 302 report of an interview Mr. Beam gave to agents—contradict

Mr. Sheneman's representations, and indicate that Mr. Beam's testimony would have been devastating to Mr. Sheneman's defense. For example, according to the 302 report, Mr. Beam reported that Mr. Sheneman "became like a silent partner at Superior Mortgage," and "pressed him (Beam) to let his son, Jeremie Sheneman (Jeremie), originate mortgage loans out of Superior Mortgage." [DE 185-20]. He stated that the Shenemans "had their own space at the [Superior Mortgage] office, access to phones," and even keys, and that Mr. Sheneman "liked to be at Superior during the day typically because he needed questions answered regarding the files Jeremie was originating." [DE 185-19].

Mr. Beam further stated that "he did not review every Sheneman file," and that for properties that Jeremie owned, "although he [Mr. Beam] was listed as the [loan officer] and collected the commission on all these transactions, it was Jeremie that actually originated the loans." [DE 185-21, -22]. Additionally, Mr. Beam stated that Mr. Sheneman described his scheme to him as that he and Jeremie "would find someone to buy the property, give the buyer money to purchase, do a Power of Attorney (POA) form and then they (Mike and Jeremie) would keep the proceeds from the sale at closing." [DE 185-21]. He also identified the handwriting on one of Ms. Zoleko's loan applications as Jeremie's. [*Id.*] The Court thus has no reason to believe that Mr. Beam would have testified consistent with Mr. Sheneman's current claims, and substantial reason that he would have testified to the contrary.

In any event, it is clear that counsel acted reasonably in declining to call Mr. Beam as a witness. As counsel discussed in his affidavit, "[H]ad I called Beam as a witness, the government would likely have cross-examined him regarding the information . . . located in his interview report. Much of that information was very damaging to Michael Sheneman's defense. . . . Given all of this evidence, which would have been very damaging for Michael Sheneman's defense, I

decided as a strategic matter that any minimal benefit that Beam could provide as a witness would be heavily outweighed by the risks of using him as a witness." [DE 285-1 p. 19–20]. Furthermore, since Mr. Beam's proposed testimony would relate primarily to the loan documents, with which Mr. Sheneman was not involved, counsel did not believe that it would be "a wise strategic move" to address that topic. [DE 285-1 p. 18]. Likewise, counsel "did not believe that Beam would implicate himself in mortgage fraud if he testified." [*Id.*]

"[T]he decision not to call a witness to testify can be a strategic decision," and such a decision is sound "if it is based on the attorney's determination that the testimony the witnesses would give might on balance harm rather than help the defendant." *Foster v. Schomig*, 223 F.3d 626, 631 (7th Cir. 2000). Counsel engaged in that analysis here, and reasonably decided not to call Mr. Beam as a witness. Given the lack of any allegation that Mr. Sheneman was involved in the wrongdoing relative to the loan applications and counsel's strategy to separate Mr. Sheneman from that wrongdoing as much as possible, Mr. Beam's testimony had little benefit to offer. Meanwhile, the risk of harm to the defense was substantial, as the 302 report indicates that Mr. Beam would not only deny his own involvement in the fraud, but would strengthen the link between Mr. Sheneman and Jeremie and the fraudulent applications. It was well within the range of reasonable trial strategy to decline to call such a risky and, likely, harmful witness. For those same reasons, no prejudice resulted to Mr. Sheneman's defense from counsel's decision not to call Mr. Beam as a witness; if anything, Mr. Sheneman's defense benefitted from the lack of this damaging witness from trial.

As an alternate basis for satisfying the first *Strickland* prong as to Mr. Beam, Mr. Sheneman has also argued that counsel failed to call Mr. Beam due to the presence of a potential

conflict of interest.[8] Mr. Jones' law partner had represented Mr. Beam in a prior, unrelated criminal matter, and Mr. Jones filed an appearance in Mr. Beam's case "as a backup in case [his partner] needed assistance with the representation." However, Mr. Jones "never appeared in court on Beam's case or prepared any pleadings on Beam's case," and "never even saw, spoke with or met Beam." Mr. Jones states in his affidavit that his partner's "prior representation of Beam played no role whatsoever in [his] strategic decision not to call Beam as a witness in Michael Sheneman's case." [DE 285-1 p. 20–21]. Mr. Sheneman has offered no reason to disbelieve this explanation or to believe that Mr. Jones' partner's representation of Mr. Beam affected his decision not to call him at trial. It is highly unlikely that the prior representation could have done so anyway, as Mr. Beam's case (in which he was convicted of criminal deviate conduct) had nothing to do with fraud or real estate and would be unlikely to have revealed any information relevant to this matter. Thus, Mr. Sheneman cannot show that any potential conflict impacted his defense. And as just discussed, his defense with not prejudiced by Mr. Beam's absence, either. Therefore, the Court rejects Mr. Sheneman's potential-conflict-of-interest argument as a basis for his ineffective-assistance claim.

### 10. Ms. Zoleko's 302 Report

Last, Mr. Sheneman argues that his attorney should have further cross-examined Ms. Zoleko by impeaching her with prior inconsistent statements referenced in a 302 report. Specifically, according to the 302 report, Ms. Zoleko "stated that she signed a purchase agreement form and probably three other forms" and "advised she has met Andy Be[a]m at Superior Mortgage," [DE 213-2], while she testified at trial that she had only signed one form

---

[8] The Court already held that no actual conflict of interest was present, which excluded a claim under *Cuyler v. Sullivan*, 446 U.S. 335 (1980). [DE 255 p. 26–31]. The supplemented record casts no doubt on that holding.

prior to the closings and that she had not talked to Mr. Beam. [DE 72 p. 40–41, 133–34 ("I've

seen [Mr. Beam] there at Superior Mortgage, but I never spoke with him or made any kind of

arrangement or do [*sic*] any kind of business with him"), 151].

Counsel offered the following reasons for why he did not pursue this particular avenue of

cross-examination:

> I did not deem it to be strategically significant whether Zoleko signed one blank
> form (as she testified) or several (as recorded in her 302). She was consistent that
> the form(s) she signed were essentially blank and lacked descriptions of any
> properties, which was the salient point of this portion of her testimony. There were
> other significant issues about which I cross-examined Zoleko, and I did not want to
> distract from those issues with further cross-examination on a very minor point.
> Further, as Michael Sheneman was not involved in this interaction, I deemed it
> important to separate him from any connection to this portion of Zoleko's
> transactions.

> Similarly, I did not consider it to be significant whether Zoleko met Andy Beam at
> Superior Mortgage. Zoleko testified unequivocally that Beam had not interviewed
> her as her mortgage application reported, and the interview report did not contradict
> this testimony. . . . Further, as Michael Sheneman was not involved in this
> interaction, I deemed it important to separate him from any connection to this
> portion of Zoleko's transactions.

[DE 285-1 p. 21–22].

As previously noted, "deciding what questions to ask a prosecution witness on cross-

examination is a matter of strategy." *Jackson*, 546 F.3d at 814. Here, counsel vigorously cross-

examined Ms. Zoleko on a number of salient points. He established that the Shenemans had not

solicited her to do business with them, but that she had approached them looking for a business

opportunity, and that she had the opportunity to inspect the houses, to consider whether to

purchase the homes, and to decline to make the purchases. [DE 72 p. 86–90]. He further elicited

admissions from Ms. Zoleko that she had signed documents at closing that contained falsehoods,

and that her signature appeared on a number of purchase agreements and other documents dated

prior to the closings. [DE 72 p. 97–117]. Counsel's estimation of the limited value of also

impeaching Ms. Zoleko with the 302 report was reasonable, as was his decision not to dilute the impact of the other lines of cross-examination that he pursued. *See Bergmann v. McCaughtry*, 65 F.3d 1372, 1379–80 (7th Cir. 1995) (holding that counsel was not ineffective for deciding not to further cross-examine witnesses on points that "relate to collateral issues, and not to the substance of the crimes"); *Burns v. Hompe*, 339 F. App'x 624, 628 (7th Cir. 2009) (noting that "deciding which questions to ask a witness is a matter of trial strategy," and holding that counsel's cross-examination was not ineffective where contradicting a witness on certain "minor points would not have undermined the basic consistency of [the witness'] testimony"). Therefore, he was not ineffective in this respect.

For similar reasons, there was no prejudice to Mr. Sheneman's defense. Whether Ms. Zoleko signed one document or several prior to closing was neither a substantial discrepancy— both stories are consistent with her limited involvement in the loan application process—nor a particularly meaningful fact for Mr. Sheneman. And in any event, counsel elicited admissions from Ms. Zoleko that her signature appeared on a number of documents that were dated prior to the closing, which squarely presented to the jury the contradiction as to how many documents Ms. Zoleko actually signed prior to closing. The 302 report would have added little more. Likewise, Ms. Zoleko's testimony that she was aware of but had not interacted or done business with Mr. Beam was not substantially contradicted by the statement in her 302 report that she had met Mr. Beam. The minor inconsistency on this ancillary point would have had no tendency whatsoever to influence the outcome of trial. Thus, Mr. Sheneman has failed to meet either *Strickland* prong as to this evidence.

**B.** **Mr. Sheneman's Ineffective-Assistance Claim as a Whole**

Having addressed each of the individual errors asserted by Mr. Sheneman, the Court now evaluates his ineffective-assistance-of-counsel claim as a whole. *Peoples v. United States*, 403

F.3d 844, 848 (7th Cir. 2005) ("[I]neffective assistance of counsel is a single ground for relief no matter how many failings the lawyer may have displayed. Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground of relief.").

### 1.     Counsel Did Not Perform Deficiently

Mr. Sheneman bears the burden of demonstrating "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. As discussed above, he has failed to identify even one such error, the Court need not belabor this portion of the analysis. *Li*, 648 F.3d at 533 ("As we have detected no unreasonable errors in assistance, we cannot conclude that there was any cumulative effect from these errors that would have amounted to ineffective assistance of counsel as evaluated under the *Strickland* parameters."). But having observed counsel's performance during trial, and having thoroughly considered the record and all of Mr. Sheneman's habeas submissions, the Court can comfortably state that counsel's performance far surpassed the constitutional threshold of adequacy. Thus, even if counsel had erred in one or more of the above respects, this active and capable advocacy surely provided Mr. Sheneman with the assistance of counsel guaranteed by the Sixth Amendment. *Richter*, 562 U.S. at 111 (noting that "it is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy"); *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) ("[T]he question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks.").

The government began by presenting testimony from two individuals who had worked at Superior Mortgage, Tanya Boettcher and Lauren Duesler. These witnesses' testimony primarily

related to Jeremie's activities as a loan officer, and counsel quite appropriately used his cross-examination of these witnesses to separate Mr. Sheneman from that process, eliciting admissions from the witnesses that Mr. Sheneman was never a loan officer, never filled out a loan application to their knowledge, and was not an employee at Superior Mortgage. [DE 71 p. 57–58, 85, 92–96].

Next, the government called two witnesses who had sold homes to or through Mr. Sheneman: Elinor Tyl and Kevin Shaw.[9] Mr. Sheneman essentially purchased sets of properties from these two sellers as a middleman, and then arranged for other buyers to purchase the properties. As to some of the properties, Mr. Sheneman acquired power of attorney over the property, sold the property to another buyer, signed the paperwork on behalf of the seller, and then negotiated the proceeds to himself. The government also admitted several checks from the title company made out to the sellers that had been signed in their name and made payable to Mr. Sheneman, but which the buyers denied having signed. On cross-examination, however, counsel established that each of the sellers had gotten exactly what they expected out of the transactions, and that Mr. Sheneman had not stolen from them. He also showed as to Mr. Shaw that there was a specific reason for having used a power of attorney, in that Mr. Shaw was leaving town and could not be present at the closing. In addition, counsel showed that the power of attorney had been publicly filed with the Recorder's office, which reduced the suggestion that the power of attorney was used for deceptive purposes. Likewise, Ms. Tyl testified on direct examination that she signed a power of attorney for Mr. Sheneman because she was going to be out of town. Furthermore, counsel cross-examined these witnesses about the quality and condition of their

---

[9] A third seller, Eric McGinness, only testified about selling property to Jeremie.

homes, and both witnesses attested that their properties were in good shape. [*E.g.*, DE 72 p. 19 ("I was very proud of my houses. . . . [T]hey were always the best houses on the block.")].

The government then presented testimony from the four buyers, who made a variety of allegations against Mr. Sheneman, all of which counsel addressed in some fashion. As to allegations that Mr. Sheneman had concealed the condition of the properties, counsel addressed on cross-examination that the buyers had the right to receive appraisals and that appraisals were in fact performed on each property, that the buyers had the opportunity to see each of the properties before they bought them, and that they could have declined to purchase any property they did not want. He also introduced in his own case in chief the sales agreement between Ms. Tyl and Mr. Sheneman, which stated, "It is expressly understood that NO ONE is to have any direct contact with or approach the tenants of any of the properties," (Exhibit M-31), which explained why Mr. Sheneman had not brought the buyers inside those properties. Counsel also introduced evidence through other witnesses that the properties were actually in good condition, such as through the sellers, and through an appraiser who testified about the quality of the property and the renovations that had been done. Further, counsel introduced many purchase agreements, each of which stated that the properties are being sold "AS IS," which undermined the buyers' testimony that Mr. Sheneman told them he would be making any needed repairs. *Id.*

As to allegations that Mr. Sheneman misrepresented the tenancy status of the properties, counsel examined the buyers about the appraisals that showed the properties were rented and that offered opinions about the market rental rates for the properties. Further, Ms. Tyl represented in her sale agreement with Mr. Sheneman, which encompassed six properties, that "[a]t this time, all properties are rented and the seller [h]as no notice of any tenants planning to vacate." (Exhibit M-31).

The buyers also testified that they had not paid any of the down payments for their properties, and that Mr. Sheneman typically paid those amounts at closing himself. Auditor Urbanowski, the government's forensic auditor, likewise testified about Mr. Sheneman's financial contributions to the closings. To attempt to lessen the appearance of impropriety of that conduct and suggest that Mr. Sheneman's payments were disclosed to the lenders, counsel introduced multiple purchase agreements, each of which stated, "Seller shall pay any applicable closing costs not to exceed 10% of the amount financed," and "Seller to pay up to 5% closing." (Exhibit M-4, M-7, M-11, M-14, M-17–M-20, M-25). He then cross-examined Auditor Urbanowski, who stated that he had not evaluated whether Mr. Sheneman's payments exceeded these amounts. Counsel was also able to get Auditor Urbanowski to admit that a summary exhibit he prepared was misleading in one respect. [DE 77 p. 204].

To address the various misrepresentations in the loan applications, counsel actively and consistently disassociated Mr. Sheneman from that process altogether and separated him from Jeremie. He showed through his cross-examination of the buyers that Mr. Sheneman was not involved in preparing their loan applications and had little, if any, knowledge about their financial condition. [*E.g.*, DE 77 p. 32 (Denaway: "Q. Did Michael Sheneman ever get involved with you in the loan process? A. No. . . . Q. Did Michael Sheneman have anything to do with that process at all? A. No."); DE 72 p. 87 (Zoleko: "Q. You never gave Michael Sheneman, for example, your credit score, Michael Sheneman? A. No. Q. You never gave Michael Sheneman your Social Security number? A. I would not -- I would say no, not directly to him, no. Q. You never gave him your tax returns or anything like that? A. No. . . . Q. The only thing that Michael Sheneman -- the only thing that you told Michael Sheneman was that you were qualified to perhaps purchase this property? A. Yes."), p. 196–97 (similar with Mr. Davies)]. As noted

above, he also showed through his cross-examination of Ms. Boettcher and Ms. Duesler that Mr.

Sheneman was not involved in preparing loan applications at Superior Mortgage. Further, he

offered testimony through his own witness that Mr. Sheneman was never an owner of Superior

Mortgage.

Counsel also advanced the theme of separating Mr. Sheneman from Jeremie at length

during his opening statement and closing argument, stating in his opening:

> Now, Mr. Barrett, during his opening, continually used the phrase "the
> Shenemans," "the Shenemans." And I believe some of his documents he showed
> on the overhead projector said "the Shenemans." I don't represent "the
> Shenemans." I represent Michael Sheneman . . . . I know his son is charged here,
> too, but I want to make clear -- and the judge has told you -- that each of these two
> individuals stand independent of one another. They are individuals and they need
> to have individual consideration. The verdict forms that you're going to get at the
> end of the case are not going to say "the Shenemans," guilty or not guilty. They are
> going to have an individual verdict form; one is going to say "Michael Sheneman"
> and one is going to say "Jeremie Sheneman." . . . And they do have the same last
> name, but I implore you to judge them independently.

[DE 71 p. 29–30]. He returned to this discussion during his closing argument:

> I will begin where I began on Monday and ask that you -- when you consider this
> case that you consider each defendant independently: What did they do; what didn't
> they do. . . . So whatever the government proved or didn't prove with Jeremie
> Sheneman should not have any bearing on your independent consideration of
> Michael Sheneman, and the same holds true in reverse. And I think that's something
> you're going to have to talk about during your deliberation. Another way to say it
> is: What did each of them know? . . . And I don't believe the government proved
> beyond a reasonable doubt that Michael Sheneman necessarily knew what they said
> Jeremie Sheneman was doing. And that's their burden.

[DE 78 p. 141–42].

Finally, as to the appearance that Mr. Sheneman had profited greatly off of the sale of the

properties at issue, counsel showed through multiple witnesses that the government offered no

evidence as to how much, if anything, Mr. Sheneman actually made. During Mr. Shaw's

testimony, the government showed that Mr. Sheneman had received $45,000 on a property for

which he paid Mr. Shaw $30,000. But on cross-examination, Mr. Shaw admitted that Mr.

Sheneman's profit would have been reduced by any renovation expenses he incurred, which could have included work such as "a new roof, new paint, new carpet, new windows." [DE 72 p. 18]. Counsel also discussed this at length during Auditor Urbanowski's testimony. A summary exhibit prepared by Auditor Urbanowski listed the proceeds from the sale of each of the properties, which totaled over $3 million. Counsel addressed on cross-examination that proceeds were not equivalent to profits, and that to calculate Mr. Sheneman's profits, you would need to subtract out anything he paid for the properties and the cost of any work he might have put into the property. Auditor Urbanowski further admitted that he had never made a calculation as to what Mr. Sheneman's actual profits were, and that he had no idea what profit Mr. Sheneman made. [DE 77 p. 214–15].

In sum, counsel actively and competently addressed each of the allegations and lines of evidence against his client. Though Mr. Sheneman was nonetheless found guilty, that was a reflection of the strength of the government's case against him, not the adequacy of his defense. To put the quality of Mr. Jones' representation into context, it is worth noting that even with the benefit of time and hindsight, Mr. Sheneman has identified very little that his counsel could have done differently. His filings have raised a number of substantive arguments his counsel should have presented, all of which would have been meritless. He has also expended hundreds of pages of filings arguing what his attorney should have done differently at trial, and he identified multiple experts, numerous lay witnesses, and an array of exhibits that he believes should have been offered. But after trimming away the evidence that would not have been admissible or that counsel actually did offer, as well as the evidence for which Mr. Sheneman has provided no support, all that remains is a lay witness with no firsthand knowledge of the homes in question, an expert witness whose testimony would have been cumulative on one topic and of little value

and likely inadmissible on the other, and a few documents that went to minor issues that counsel addressed through other respects. Counsel offered sound strategic reasons for declining to offer that evidence at trial, so his performance was not deficient. And even absent those justifications, his active and capable representation provided Mr. Sheneman with the assistance of counsel even if he erred by not offering that evidence at trial. Therefore, Mr. Sheneman has not met his burden under the first *Strickland* prong of showing that his counsel's performance was deficient, so his claim fails on that basis.

### 2. Mr. Sheneman's Defense Was Not Prejudiced

To satisfy the second *Strickland* prong, Mr. Sheneman must show that counsel's deficient performance prejudiced his defense—"that counsel's errors were so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland*, 466 U.S. at 687. This means showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Eckstein*, 460 F.3d 844, 848 (7th Cir. 2006) (quoting *Strickland*, 466 U.S. at 694).

Here, even had counsel utilized all of the additional evidence at issue, there is not a reasonable probably that the result of the proceeding would have been different. Mr. Sheneman argues that the single most important deficiency in counsel's performance was his failure to call Mr. Molenda from the Code Enforcement Division. If that is the case, then Mr. Sheneman's prejudice claim is easily resolved against him, as Mr. Molenda's testimony would have been of minimal value, if any at all. As discussed above, Mr. Molenda had no firsthand knowledge of the quality of any of the homes—he does not claim that he had ever inspected or even seen any of the homes in question. All he could testify to was that code violations had not been reported to the city for these homes. But that says little about the actual quality of the properties, and, as Mr.

Molenda stated in his second affidavit, does not show whether the properties were actually up to code or not. Meanwhile, as also discussed above, Mr. Sheneman's counsel offered much evidence supporting the quality of the properties that was based on personal observation, including through the testimony of the sellers and an appraiser, and the introduction of multiple appraisals. It is thus inconceivable that Mr. Molenda's testimony on this point could have had any impact whatsoever on trial.

Mr. Sheneman also argues that Mr. Molenda would have testified that Mr. Sheneman was in the business of buying, repairing, and selling properties, and that it was common in that business at the time for the properties to be in others' names. Besides being outside the scope of this Court's prior order, this testimony would have added no value to Mr. Sheneman's defense. Multiple witnesses testified at trial about Mr. Sheneman being in the business of repairing homes, and Mr. Molenda's testimony would have added no further value on that point. In addition, Mr. Molenda offers no foundation for his testimony about what was common in the real estate business at the time, so that testimony would likely not even have been admitted. Moreover, Mr. Sheneman's use of powers of attorney and his manner of acquiring the rights to sell properties were thoroughly discussed at trial, and Mr. Sheneman has admitted that his attorney proved that the use of powers of attorney was commonplace, so Mr. Molenda's testimony on that point would have had no effect anyway.

Mr. Sheneman argues secondarily that he was prejudiced by counsel's decision not to investigate and offer a handwriting expert at trial. As to Ms. Hampton's first report, which analyzed Ms. Zoleko's signatures, this evidence would have been wholly unnecessary and cumulative, as Ms. Zoleko admitted that her signature appeared on multiple documents, and she never denied the authenticity of any of her signatures. She questioned whether she had seen the

documents before or how her signature came to appear on the documents, but a handwriting analysis could not speak to the circumstances under which Ms. Zoleko's signature came to be on the documents or to the contents of the documents at the time, so Ms. Hampton had nothing to offer on that point. As to the second report, which analyzed the handwriting on the photocopied loan applications, the reliability of the report is fatally undermined by the absence of any known exemplar of Ms. Zoleko's handwriting, as Ms. Hampton identified no reasoned basis on which to conclude that Ms. Zoleko was the writer of the handwriting in the control document. And in any event, evidence that Ms. Zoleko had written the property addresses on four loan applications does very little to rebut the evidence of Jeremie's misconduct relative to those applications.

Mr. Sheneman also argues that the effect of this evidence would have been multiplied if used in combination with the 302 report and the pre-closing documents for the California Street property. The cumulative effect of this evidence, he argues, would have undermined Ms. Zoleko's testimony about the extent of her involvement in the loan application process. The Court disagrees, as whether alone or in combination, these documents at best present minor inconsistencies as to secondary aspects of a single witness's testimony about a single aspect of the fraud. Accordingly, even if counsel had presented all of the evidence in question at trial, that evidence would have had minimal potential, if any, to affect the outcome of trial.

Conversely, the evidence of Mr. Sheneman's guilt was quite strong, which further reduces the likelihood that any additional evidence would have changed the outcome of trial. *Eckstein*, 460 F.3d at 848 ("A verdict or conclusion that is overwhelmingly supported by the record is less likely to have been affected by errors than one that is only weakly supported by the record."). Perhaps most damning was the evidence that Mr. Sheneman paid every dollar of the down payments for the sixty properties at issue, without disclosure to the lenders. Mr. Sheneman

has offered various explanations to try to account for this, but none of them hold any water. For one, Mr. Sheneman has argued that all of the loans were the product of 100% financing policies, through which the mortgage companies financed the entire purchase price of the homes without requiring any down payment. The undisputed evidence at trial directly contradicts that argument, though. With the sole exception of Ms. Zoleko's Granger property, every other property was financed at only eighty-five to ninety percent of the purchase price, (Exhibit 36, and each of the closing statements), requiring the buyers to make a down payment of ten to fifteen percent. In addition, this argument defies not only the evidence, but logic as well: If every property was 100% financed, then why would Mr. Sheneman have sent hundreds of thousands of his own dollars—$428,874.62, according to the government's unrebutted calculation—to the closings in order to complete the transactions? Not only did those payments exceed the total amount of closing costs, that sum does not include the many thousands of dollars of closing costs that the HUD-1 forms already reflected as being charged to or paid by the sellers and that were thus deducted from the sellers' proceeds at closing. Thus, Mr. Sheneman's actual financial contributions to the transactions were much greater than $428,874.62.

Mr. Sheneman has also argued that his payments actually were disclosed to the lenders, since the purchase agreements stated, "Seller shall pay any applicable closing costs not to exceed 10% of the amount financed," and "Seller to pay up to 5% closing." However, this rationale apparently relies entirely on sleight of hand to equate closing costs with down payments, as those documents only show that Mr. Sheneman's payment of closing costs was disclosed to the lenders. Mr. Sheneman has pointed to no evidence that would have disclosed his down payments to the lenders. To the contrary, every closing statement that was introduced at trial (again, with the sole exception of Ms. Zoleko's Granger property), shows amounts being due at closing from

the buyers. Under Mr. Sheneman's theory, every HUD-1 form would have listed a balance of zero dollars to or from the buyers at closing, but that is not the case: they each reflect amounts being due from the buyers instead of deducting those amounts from Mr. Sheneman's or the other buyers' proceeds. On top of that, this argument would not explain why Mr. Sheneman paid the down payments on properties for which he was not the seller and was not a party to the purchase agreements or the transactions. And if these amounts really represented closing costs that had actually been disclosed to the lenders, they could have simply been deducted from the sellers' proceeds at closing, as other portions of the closing costs were, instead of being brought to the closings in checks from Mr. Sheneman.

Mr. Sheneman also took steps to conceal his involvement from the lenders, including by ensuring that his name did not appear on any checks brought to closing. Accordingly, none of the disbursement reports from the closing companies reflect the receipt of any payments from Mr. Sheneman. And in at least one case, in order to make it appear that the funds were coming from the buyer, he wrote a personal check to Mr. Davies and directed Mr. Davies to go to his bank, deposit the check, and get a cashier's check issued from his own bank, all the while accompanied by an escort to make sure Mr. Davies returned with the funds. Further, Mr. Sheneman admitted to investigating agents that he believed he was permitted to pay closing costs but that it would be illegal to pay down payments, showing that he understood the difference between those concepts and that he understood he was defrauding the lenders by paying the down payments. [DE 77 p. 159]. None of the evidence Mr. Sheneman has submitted in this proceeding addresses this aspect of the fraud, and on the weight of this evidence alone, Mr. Sheneman would have almost certainly been convicted at trial.

That was not the only evidence against Mr. Sheneman, though. The four buyers each testified to substantially similar conduct by Jeremie and Mr. Sheneman to induce them to purchase the properties. The buyers were each assured of the quality of the homes and their rental status, but they testified credibly that many of the homes were in fact in quite poor condition or did not have any tenants. The buyers' testimony about quality of the homes, including the substantial time and money they had to put into making the homes rentable and their descriptions of the specific defects with the properties, was much stronger than the evidence to the contrary offered by Mr. Sheneman's counsel at trial and by Mr. Sheneman in this proceeding. For example, Mr. Doolittle testified that for six to eight months, he spent every Friday, Saturday, and Sunday repairing the properties just to get them into rentable condition. [DE 72 p. 245]. Mr. Denaway likewise testified that he spent months of his time and at least $45,000 fixing the properties. [DE 77 p. 29]. And while the evidence showed that the buyers at least had the right to see appraisals or look around the properties prior to buying them, their testimony indicated that the Shenemans made various excuses to prevent them from doing so. The Shenemans also made other promises, such as that they would make any repairs to the homes that became necessary, they would place tenants in any properties that became vacant, and that they would purchase the properties back from the buyers if the buyers wanted. But the evidence indicated that they never intended to follow through on those promises, as when those situations arose, the Shenemans made token efforts, if any, and largely refused to comply.

Further, there was undisputed fraud in the loan applications, so the only question was whether it was part of a scheme in which Mr. Sheneman was participating. Despite a name other than Jeremie's appearing on each loan application as the interviewer, the buyers testified that they had never spoken to or been interviewed by those individuals, and that they had only dealt

with Jeremie throughout the loan application process. While Jeremie was not officially employed by Superior Mortgage, he worked out of and had an office at Superior Mortgage, and he had been a loan officer during his time at Tri-State Mortgage and was experienced and knowledgeable in the mortgage industry. The buyers also testified that they had limited involvement themselves in the loan application process, in that they provided little information and signed few documents and then very quickly had to attend the closings. As to each of the buyers, the person with the access and knowledge to commit the fraud was Jeremie, and the evidence of his guilt was overwhelming.

Despite counsel's best efforts to separate Mr. Sheneman from this aspect of the fraud, the evidence of Mr. Sheneman's connection to the fraud in the loan applications was strong as well. First, Mr. Sheneman's financial involvement in the loan process, including padding the buyers' bank accounts prior to closing and funding all of the down payments, indicate that he was aware of the fraud in the loan applications and that it was part of his scheme to defraud. Further, he acted in concert with Jeremie as to other aspects of the fraud, including their various misrepresentations, omissions, and acts of concealment in inducing the buyers to purchase the properties, suggesting that this was part of their joint scheme, too. In addition, there was strong evidence that the Shenemans shared in the profits of their scheme, as the proceeds from most of the sales went to Mr. Sheneman's accounts, and Mr. Sheneman transferred hundreds of thousands of dollars into Jeremie's account during this time period. All of this further indicates that the Shenemans were working in concert with each other as part of this scheme to defraud, which further strengthens the case against Mr. Sheneman.

On the whole, the evidence against Mr. Sheneman was quite strong, and the evidence Mr. Sheneman now offers in support of this ineffective-assistance claim would affect little of that

evidence. Therefore, even assuming that counsel was ineffective for failing to offer this evidence at trial, Mr. Sheneman has failed to show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. He has thus failed to show prejudice from any ineffective assistance, so his claim fails for that independent reason, too.

## C.        No Hearing Is Necessary to Resolve Mr. Sheneman's Claim

Finally, no hearing is necessary on Mr. Sheneman's claim. The record conclusively establishes that Mr. Sheneman is entitled to no relief, and he has presented no factual disputes that, if resolved in his favor at a hearing, would justify relief. "Under Rule 7 [of the Rules Governing Section 2255 Proceedings for the United States District Courts], the judge can direct expansion of the record to include any appropriate materials that 'enable the judge to dispose of some habeas petitions not dismissed on the pleadings, without the time and expense required for an evidentiary hearing." *Blackledge v. Allison*, 431 U.S. 63, 82 (1977); *Lafuente*, 617 F.3d at 946–47 (noting that "a full evidentiary hearing is not the only option available to the district court to resolve the essential disputed facts" on a § 2255 petition, and that a "district court also has the authority to order discovery or something short of a full-blown hearing to allow adequate inquiry into a petitioner's claim, or to help the court determine whether a full hearing is necessary"); *Wright*, 125 F.3d at 1044 (stating that the "Supreme Court has also made it clear . . . that the district court has the prerogative of fashioning a course of proceeding short of a full-blown hearing to avoid the need for such a hearing").

Consistent with that authority, the Court has given Mr. Sheneman extensive opportunity to supplement the record with evidentiary support so as to allow adequate inquiry into his claim. Despite that opportunity and the assistance of counsel, Mr. Sheneman has supported little of what he initially argued his attorney could have produced at trial. In addition, the government

has filed an affidavit from Mr. Jones explaining the strategic reasons why he declined to pursue

that evidence at trial. While Mr. Sheneman attempts to create factual disputes by arguing that

counsel should have pursued different strategies at trial, that is beside the point. The question is

not whether counsel pursued the best possible strategy or the strategy that his client preferred,

but simply whether the strategy counsel did pursue was reasonable. As discussed at length above,

counsel's strategies were reasonable, and a hearing would not alter that conclusion. Therefore,

the Court denies Mr. Sheneman's request for a hearing, and denies his § 2255 motion on the

basis of the existing, supplemented record. Because no hearing is necessary, the Court also

denies Mr. Sheneman's renewed request for discovery.

## IV. CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2255 Proceedings for the United

States District Courts, the Court must "issue or deny a certificate of appealability when it enters a

final order adverse to the applicant," and the Rule permits the Court to hear further argument on

whether a certificate of appealability should issue.  A certificate of appealability may be issued

"only if the applicant has made a substantial showing of the denial of a constitutional right." 28

U.S.C. § 2253(c); Rule 11, Rules Governing Section 2255 Proceedings for the United States

District Courts.  The substantial showing standard is met when "reasonable jurists could debate

whether (or, for that matter, agree that) the petition should have been resolved in a different

manner or that the issues presented were adequate to deserve encouragement to proceed further."

*Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quotation marks omitted) (quoting *Barefoot v.*

*Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see Young v. United States*, 523 F.3d 717 (7th Cir.

2008).  A defendant is not required to show that he will ultimately succeed on appeal. *Miller-El*

*v. Cockrell,* 537 U.S. 322, 342 (2003) (stating that the question is the "debatability of the

underlying constitutional claim, not the resolution of that debate").

Here, the Court finds that Mr. Sheneman has failed to make a substantial showing of the denial of a constitutional right. His claims of a constructive amendment of the indictment, improper jury instructions, and solicitation of perjury by the government, which the Court rejected in its previous order, were wholly meritless. As to his claim for ineffective assistance of counsel, Mr. Sheneman has shown relatively little else that his counsel could have done. As to the evidence Mr. Sheneman has provided in support of his claim, counsel offered sound strategic reasons for declining to pursue that evidence, and no prejudice would have resulted anyway. And when analyzed against the backdrop of everything else counsel did in Mr. Sheneman's defense and the strength of the case against him, it is clear that Mr. Sheneman has fallen well short of meeting his burden on either *Strickland* prong. Therefore, the Court does not believe that the resolution of any of Mr. Sheneman's claims is subject to debate, and declines to issue a certificate of appealability as to any issue in this matter.

The Court advises Mr. Sheneman that pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure, when the district judge denies a certificate of appealability, the applicant may request a circuit judge to issue the certificate. The Court further advises Mr. Sheneman that Rule 4(a) of the Federal Rules of Appellate Procedure governs the time to appeal an order entered under the rules governing § 2255 proceedings. *See* Rule 11(b), Rules Governing Section 2255 Proceedings for the United States District Courts. Under Rule 4(a), when the United States is a party in a civil case, any notice of appeal may be filed by any party within 60 days after the judgment or order appealed from is entered. Fed. R. App. P. 4(a); *Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006) (stating that "the time to contest the erroneous denial of [the defendant's] first § 2255 motion was within 60 days of the decision").

## V.  CONCLUSION

The Court previously rejected most of the claims Mr. Sheneman presented in his motion under § 2255. As to the remaining claim, the Court finds that Mr. Sheneman received effective assistance of counsel, and that, even if counsel's performance was deficient, Mr. Sheneman's defense was not prejudiced, so the Court rejects his ineffective-assistance claim, too. Therefore, the Court DENIES Mr. Sheneman's motion for relief under § 2255 and his requests for a hearing and for additional discovery. [DE 185, 330]. The Court also DECLINES to issue a certificate of appealability. The Clerk is DIRECTED to enter judgment as to Mr. Sheneman's motion under § 2255.

SO ORDERED.

ENTERED:  July 8, 2015

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court